IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATES OF AMERICA**,

        Plaintiff,

    v.

**DEQUANDRE RAYMONE DAVIS**,

        Defendant.

3:13-cr-00346-MO

**OPINION AND ORDER**

**MOSMAN, J.**,

    On the evening of June 19, 2013, Officer Brian Dale and Sergeant Troy King of the Portland Police Bureau stopped a white Mercedes in Northeast Portland, believing that the driver of the car failed to signal a lane change in violation of Oregon law.  The preceding weeks had seen an increase in gang violence, and the officers were concerned that the occupants of the car—which generally fit the description of a car seen at the funeral of a gang member earlier that day—may have been carrying weapons.  The defendant, Dequandre Davis, was riding in the back seat of the Mercedes at the time of the stop.  Gresham Police Officer Jim Petersen soon arrived on the scene to assist Officer Dale and Sergeant King; Officer Petersen asked the driver

1 – OPINION AND ORDER

for consent to search the car.  The driver consented, and the officers asked the occupants to exit

the car.  During the search, Officer Dale discovered a handgun located inside a coat.  The coat

belonged to Mr. Davis and was lying on the rear passenger seat.  Mr. Davis was placed under

arrest and transported to the North Precinct offices, where he confessed to owning the gun.

Mr. Davis now moves to suppress all evidence obtained as a result of the traffic stop, on

two grounds.  First, he argues that the police had no basis to initiate the investigatory traffic stop,

because the Mercedes was not located in a "lane" and was thus not required to signal a lane

change.  Second, he argues that the search of the coat was unlawful, because the search was not

justified by abandonment, consent, or reasonable suspicion that any of the passengers were

armed and dangerous.  Although I find that I cannot determine whether the car was located in a

"lane," due to insufficient and ambiguous evidence in the record, I nevertheless find that the

traffic stop was justified because any mistake on the part of the officers was a mistake of fact,

not of law.  Further, I find that although the search of the coat was impermissible under theories

of abandonment or consent, I find that the search of the coat was permissible based on the

officers' reasonable suspicion that the occupants of the car were armed.  Therefore, I DENY the

motion to suppress [24].

## BACKGROUND

### I.    <u>The Traffic Stop</u>

Portland Police Bureau Officer Brian Dale and Sergeant Troy King, members of

Portland's Gang Enforcement Team ("GET"), were patrolling Northeast Portland during the

evening of June 19, 2013.  (Mem. Supp. [25] at 1.)  Earlier that day, a funeral was held for a

Portland-area gang member, and the officers had been assigned to monitor the funeral for gang

activity.  (Tr. [50] at 21:24–23:3.)  GET officers observed two white Mercedes at the funeral.  *Id.*

At 8:25 p.m., the officers stopped one of the Mercedes, seen earlier at the funeral, at the corner of Northeast Glisan Street and Northeast 156th Avenue. (Mem. Supp. [25] at 2.) Officer Dale indicated in his report that he saw the vehicle move from the "shoulder" on the east side of Northeast 156th Avenue into the northbound traffic lane, without signaling. *Id.* He reported that, prior to moving onto the roadway, the Mercedes was stopped in a "paved parking lane." (Resp. [34] at 2.) Officer Dale testified that the surface to the side of 156th was "like part of the slab, or part of a partially poured shoulder area for parking." (Tr. [50] at 32:17–18.) Although Officer Dale testified that he did not believe there was a curb along 156th Avenue, he believed the Mercedes was located "to the side of the road where someone would park," prior to pulling into the street. *Id.* at 30:18–31:6. Similarly, Sergeant King testified that when the officers saw the white Mercedes, "it was pulling away from that paved area just in front of that second house north of Couch [Street]." *Id.* at 112:3–5.

Officer Dale approached the car and contacted the driver, Corey Johnson, and then identified the three passengers, Arthur Davis, Michael Collins, and Defendant Dequandre Davis. (Resp. [34] at 2.) Officer Dale recognized Arthur Davis, and recalled that Arthur was associated with the Columbia Villa Crips gang, but was unsure whether Arthur was on probation. (Tr. [50] at 40:23–41:11.) Officer Dale returned to his vehicle to run a records check on the passengers. (Mem. Supp. [25] at 3.)

The records check revealed that the defendant, Dequandre Davis, was on probation. (Resp. [34] at 2.) Officer Dale contacted Gresham Police Officer Jim Petersen, also a member of GET, to request assistance. (Mem. Supp. [25] at 3.) He then called Mr. Davis's probation officer, hoping to learn whether the terms of Mr. Davis's probation required that he avoid association with known gang members. (Tr. [50] at 43:10–25.) Mr. Davis's probation officer

3 – OPINION AND ORDER

did not answer, and Officer Dale left a message.  (Mem. Supp. [25] at 3.)

## II.    <u>The Search</u>

At approximately 8:39 p.m., when Officer Petersen arrived on the scene, Officer Dale requested that he ask for permission to search the Mercedes.  (Tr. [50] at 45:5–16.)  Officer Petersen approached the vehicle and asked Mr. Johnson to exit.  (Mem. Supp. [25] at 3.)  While doing so, he noticed a dark coat on Mr. Davis's lap.  (Tr. [50] at 156:23–157:1.)

With consent, Officer Petersen frisked the driver, Mr. Johnson, for weapons.  (Mem. Supp. [34] at 3–4).  Officer Petersen asked Mr. Johnson if he had attended the funeral of a gang member who had recently been shot.  *Id.* at 4.  Mr. Johnson acknowledged that he was indeed at the funeral.  (Tr. [50] at 135:20–25.)  Officer Petersen then "asked [Mr. Johnson] if there were any weapons in the car and specifically asked for firearms."  *Id.* at 136:7–8.  Mr. Johnson said there were no firearms in the car, and when Officer Petersen asked if the police could search the car for weapons, Mr. Johnson said "yes."  *Id.* at 136:11–14.  Mr. Johnson did not "place any limitations" on his consent.  *Id.* at 136:15–16.  Officers Petersen and Dale then asked each passenger to step out of the vehicle and frisked them as they emerged.  (Mem. Supp. [25] at 4.)  None of the passengers protested, and "[t]hey were all very compliant and cooperative."  (Tr. [50] at 138:19.)  Upon exiting, Mr. Davis left his coat on the rear seat of the car.  Officer Petersen testified that he could not recall whether he told Mr. Davis to leave the coat behind, but in any event, he would not have let Mr. Davis take the coat out of the vehicle.  *Id.* at 137:19–25.  The officers did not find any weapons when they frisked the occupants.  (Mem. Supp. [25] at 4.)

Having frisked all of the occupants of the car, Officer Petersen asked Officer Dale to assist in the search of the Mercedes.  *Id.*  Officer Dale noticed Mr. Davis's coat on the rear seat of the car, and picked it up.  (Tr. [50] at 47:5–48:12.)  Officer Davis then discovered a handgun

inside a pocket of the coat: "it's a peacoat and it's heavy, but it just felt extra heavy. And I

started searching the pockets and immediately felt a handgun." *Id.* at 48:10–12. Officer Petersen

could not recall the coat pocket being buttoned or zipped, but testified that he does not normally

ask for "separate consent" to search articles of clothing in a car. *Id.* at 48:13–20. The officers

placed Mr. Davis under arrest and escorted him to Officer Dale's patrol car. (Mem. Supp. [25] at

5.) After the arrest, Officer Dale released Mr. Johnson and the remaining two passengers with a

verbal warning concerning the traffic violation. *Id.*

## III.    <u>Statements</u>

Officer Dale administered *Miranda* warnings to Mr. Davis in his patrol car at 9:04 p.m.

(Tr. [50] at 50:6–17.) Mr. Davis replied "yeah, man," which Officer Dale took to mean that Mr.

Davis understood his rights. *Id.* at 50:13–14. Officer Dale then transported Mr. Davis to the

North Precinct, where he questioned Mr. Davis about the handgun. *Id.* at 50:18–51:18. In

response to Officer Dale's questioning, Mr. Davis admitted that the firearm found in the coat

belonged to him. *Id.* Mr. Davis said that he obtained the gun that day, and only wanted a gun

for protection, not to "cause trouble." *Id.* at 51:11–15.

## DISCUSSION

## I.    <u>Reasonableness of the Traffic Stop</u>

An officer may conduct an investigatory traffic stop if the officer "reasonably suspects

that a traffic violation has occurred." *United States v. Miranda-Guerena*, 445 F.3d 1233, 1236

(9th Cir. 2006). Whether that suspicion is reasonable is an objective inquiry. *See Whren v.

United States*, 517 U.S. 806, 813 (1996) (officer's subjective intent irrelevant). Even when the

police mistakenly believe that a traffic violation has occurred, a traffic stop remains reasonable if

the error is factual and the police correctly understand the law. *See United States v. Mariscal*,

285 F.3d 1127, 1131 (9th Cir. 2002) ("A mere mistake of fact will not render a stop illegal, if the objective facts known to the officer gave rise to a reasonable suspicion that criminal activity was afoot."); *United States v. King*, 244 F.3d 736, 739 (9th Cir. 2001) ("an officer's correct understanding of the law, together with a good-faith error regarding the facts, can establish reasonable suspicion").

However, when the ostensible violation that justifies a traffic stop is premised on a legal error, the stop cannot be supported by reasonable suspicion. *See United States v. Lopez-Soto*, 205 F.3d 1101, 1106 (9th Cir. 2000); *King*, 244 F.3d at 741–42 ("an officer's mistake of law cannot form the basis for reasonable suspicion to initiate a traffic stop"). The police are presumed to understand the law, and the failure "to understand the law by the very person charged with enforcing it is *not* objectively reasonable." *United States v. Tibbetts*, 396 F.3d 1132, 1138 (10th Cir. 2005) (emphasis in original). Here, the officers stopped the Mercedes for failure to signal a lane change, in violation of Or. Rev. Stat. § 811.400. Whether this stop was reasonable, and therefore legal, turns on two questions: first, whether the car was located in a lane, such that the use of a signal was required; second, if not, whether any mistake on the part of the officers was factual or legal.

### A.    *Whether the Mercedes Was Located in a "Lane"* [1]

Oregon law requires a driver operating a vehicle on a highway to signal a turn or lane change.  *See* Or. Rev. Stat. § 811.400;[2] *State v. Thomas*, 104 Or. App. 128, 129, 799 P.2d 208,

---

[1] To provide the reader visual aid, photographs of 156th Avenue are attached to the end of this opinion. These photographs are drawn from the Government Exhibits 4 and 5 (Ex. and Witness List [44] at 1), and Defense Exhibits 101E, 101G, 101H, and 101J. (Def.'s Ex. in Supp. [62] at 15, 17–18, 20.)

[2] Or. Rev. Stat. § 811.400 reads, in relevant part:

      (1) A person commits the offense of failure to use an appropriate signal for a turn, lane change or stop or for an exit from a roundabout if the person does not make the appropriate signal . . . by use of signal lamps or hand signals and the person is operating a vehicle that is:

          (a) Turning, *changing lanes*, stopping or suddenly decelerating[.]

(emphasis added).

209 (1990).  A highway[3] is a roadway that is used for stationary or moving vehicles.  *Thomas*, 104 Or. App. at 129, 799 P.2d at 209.  In contrast, a lane is "an area of the highway designated for a particular use by a single line of vehicles[.]"  *Id.*, 799 P.2d at 209 (citation omitted).  The Oregon Court of Appeals found that because the Oregon Legislature did not qualify the term "lane" in § 811.400, the legislature must have intended the statute "to apply to all lanes of the highway, including those used for parking." *Id.* at 129, 799 P.2d at 210.  Thus, the duty to signal a lane change applies when a driver "moves from an on-street parking lane into the traffic lane." *Id.* at 130, 799 P.2d at 210.  However, if a vehicle is *not* located in a "lane" prior to entering a traffic lane, the vehicle cannot be "changing lanes" and need not use a signal.

The Government argues that Officer Dale and Sergeant King had reasonable suspicion to stop the Mercedes for violating § 811.400, because the Mercedes was located in a parking lane along the side of 156th Avenue prior to entering the flow of traffic.  (Supp. Resp. [60] at 8.)  At the January 8, 2013, hearing, Officer Dale testified that the Mercedes was located on the "shoulder" of the road.  (Tr. [50] at 31:2.)  Officer Dale clarified that the area was "[n]ot actually part of the road for travel.  It's to the side of the road where someone would park." *Id.* at 31:5–6. The surface beneath the car was "like part of a slab, part of a partially poured shoulder area for parking," and consisted of a "mix of gravel and slurry seal." *Id.* at 32:17–22.  The Government contends that this area, thus described, "could logically serve no other use than to accommodate parking for a single line of vehicles."  (Supp. Resp. [60] at 10.)  Therefore, because the Mercedes was located in a parking lane, Or. Rev. Stat. § 811.400 required the driver to signal prior to moving into the flow of traffic, and the failure to do so justified the traffic stop.  *See Miranda-Guerena*, 445 F.3d at 1236.

---

[3] A "highway" is "[e]very public way, road, street, thoroughfare and place, including bridges, viaducts and other structures within the boundaries of this state, open, used or intended for use of the general public for vehicles or vehicular traffic as a matter of right."  Or. Rev. Stat. § 801.305(1).

Mr. Davis defines a "lane" somewhat differently.  He argues that a lane is: "(1) an area of the highway, that is (2) designated, for (3) a particular use, by (4) a single line of vehicles." (Def.'s Supp. Reply [61] at 39 (citing *Thomas*, 104 Or. App. at 129–30, 799 P.2d at 209).) Under the above criteria, the testimony of Officer Dale and Sergeant King fails to show that the Mercedes was actually located in a lane.  First, the Government has failed to demonstrate the length of the strip of "mixed materials" underneath the car, "so as to fit within *Thomas*['s] description of a single line of vehicles."  *Id.* at 40 (internal quotation omitted).  Second, the Government has failed to show that the area was available for public use.  *Id.*  Third, the Government has failed to show that the area "had been constructed by any state or local government agency."  *Id.*  Officer Dale's testimony reveals that the Mercedes moved into the flow of traffic not from a "parking lane" or a "shoulder" of the highway, but from private property.  *Id.* at 42.  Indeed, Officer Dale observed that "it's not as if the city came through and poured these slabs.  It just look[ed] as though they were kind of improvised." (Tr. [50] at 83:5–7.)  Thus, § 811.400 does not apply and the stop cannot be justified by reasonable suspicion.

I find each argument lacking, for different reasons.  Mr. Davis's definition of a lane adds requirements not found in Oregon statutory or case law.  The Oregon Court of Appeals never refers to some minimum length necessary to turn an undifferentiated piece of ground into an area suitable for use by "a single line of vehicles."  *See Thomas*, 104 Or. App. at 129–30, 799 P.2d at 210.  Presumably, an area large enough to fit at least two cars, end to end, is sufficient to accommodate a "line of vehicles."  Further, there is no evidence that the area to the side of 156th Avenue was private property or otherwise unavailable for public use.  Although Officer Dale described the area as "improvised," which can perhaps be read to mean "not intended as a parking lane," this does not foreclose the possibility that the area was indeed part of the highway,

and thus a lane.[4]  Lastly, and relatedly, there is no requirement that a lane must be constructed by a government agency.  *See Thomas*, 104 Or. App. at 129–30, 799 P.2d at 210; Or. Rev. Stat. § 811.400.

On the other hand, the Government has offered insufficient evidence to demonstrate that the area along 156th Avenue is indeed a lane, such that a driver is required to signal before leaving that area and proceeding into the flow of traffic.  Officer Dale characterized the side of the road as a "shoulder area for parking," consisting of a "mix of gravel and slurry seal."  (Tr. [50] at 32:17–22.)  The officers testified that they observed the Mercedes "to the side of the road where someone would park."  *Id.* at 31:6.  Intuitively, this testimony describes a parking lane, but it does not go far enough.  The area along 156th Avenue may have regularly been used for parking, but is only part of the highway (and thus a lane) if it is "open [and] used or intended for use of the general public for vehicles or vehicular traffic as a matter of right."  Or. Rev. Stat. § 801.305.  For example, if a homeowner parks her car to the side of 156th Avenue, but the area where she parks, up to the paved portion of the street, is her private property, that area is not open to or intended for use by the general public, and is not a lane.  The Government must show that the officers "reasonably suspect[ed] that a traffic violation . . . occurred."  *See Miranda-Guerena*, 445 F.3d at 1236.  Here, the Government has offered insufficient evidence to show that the Mercedes was actually located in a lane, and thus that the driver committed a traffic violation by failing to signal before entering the flow of traffic.

**B.    *Any Mistake was Factual***

"[A] mere mistake of fact will not render a stop illegal, if the objective facts known to the

---

[4] For example, a "shoulder" of a highway may or may not be paved.  Oregon law defines the "shoulder" as "the *portion of a highway*, whether *paved or unpaved*, contiguous to the roadway that is primarily for use by pedestrians, for the accommodation of stopped vehicles, for emergency use and for lateral support of base and surface structures." Or. Rev. Stat. § 801.480 (emphasis added).

officer gave rise to a reasonable suspicion that criminal activity was afoot." *Mariscal*, 285 F.3d at 1131.  However, "an officer's mistake of law cannot form the basis for reasonable suspicion to initiate a traffic stop." *King*, 244 F.3d at 741–42.  Some mistakes can easily be classified as factual or legal.  For example, imagine that a car—in a neighborhood like the one in this case, without curbs or sidewalks—is actually located on a front lawn before entering the flow of traffic, without signaling, but an officer's visual perspective leads him to erroneously believe the car entered the flow of traffic from an on-street parking lane.  Here, the officer could reasonably suspect the car violated Or. Rev. Stat. § 811.400, because the officer understood the law but made a factual error.  *See Mariscal*, 285 F.3d at 1131.  On the other hand, if the officer *knows* that the car is located in a front lawn, but believes that the driver is required to signal before driving into the street, the officer misunderstands the law and a traffic stop for failing to signal is not supported by reasonable suspicion.  *See Lopez-Soto*, 205 F.3d at 1106.

The Government contends that if the officers' decision to stop the Mercedes was mistaken, the mistake was factual.  The ongoing dispute over whether the Mercedes was actually located in a lane demonstrates that the question is close, and there is no evidence that the officers misunderstood the requirements of the Oregon Vehicle Code.  (Supp. Resp. [60] at 10–11.)  Mr. Davis disagrees, arguing that the officers' mistake was legal, and the Government failed to show that either Officer Dale or Sergeant King correctly understood the scope of Or. Rev. Stat. § 811.400.  (Def.'s Supp. Reply [61] at 44 n.66, 45–46.)

Here, the officers' mistake, if any, was factual, and the traffic stop was justified by reasonable suspicion.  I find no evidence in the record or in either officer's testimony that demonstrates a misunderstanding of the requirements of § 811.400.  Officer Dale testified that he believed the car was located in a "shoulder" along the side of 156th Avenue.  (Tr. [50] at 31:2.)

10 – OPINION AND ORDER

A shoulder is a part of the highway (and is thus a "lane"). *See* Or. Rev. Stat. § 801.480.

According to the Oregon Court of Appeals, § 811.400 is meant "to apply to all lanes of the

highway, including those used for parking." *Thomas*, 104 Or. App. at 129, 799 P.2d at 210.

Thus, Officer Dale was correct in believing that the driver of the Mercedes was required to signal

before "changing lanes" and entering the flow of traffic, assuming the car was in fact in a lane.

Any mistake goes to the assumption that the car was actually in a lane, not to the scope or

applicability of the law. As I noted previously, the Government has offered insufficient evidence

to demonstrate that the area to the side of 156th Avenue is indeed a lane, but additional factual

evidence would clarify the ambiguity. In fact, one useful way to distinguish between questions

of fact vs. questions of law is whether further factual development would answer the question.

Here, a more fully developed factual record, for example, adducing whether the Mercedes was

on private property when it was stopped, might settle the question of whether it was in a lane.

     Although a mistake of law makes a traffic stop unreasonable, "[t]hat does not mean that

the officer must have a precise appreciation of the niceties of the law." *Mariscal*, 285 F.3d at

1130. This case is a far cry from previous mistake-of-law cases. *See, e.g.*, *Lopez-Soto*, 205 F.3d

at 1106 (officer believed Baja California registration must be visible from rear of car, but Baja

California law only required registration to be displayed in upper corner of windshield); *United

States v. Twilley*, 222 F.3d 1092, 1096 (9th Cir. 2000) (officer believed Michigan law required

cars to display two license plates, but Michigan law only required one). Here, the facts known to

the officers at the time of the traffic stop were sufficient to lead them to reasonably conclude that

a traffic violation had occurred. If the officers were mistaken, their mistakes were factual, and

not based on a misunderstanding of the scope of the law. *See United States v. Dorais*, 241 F.3d

1124, 1130–31 (9th Cir. 2001) (when facts give rise to a reasonable suspicion that a traffic

violation occurs, a later determination that no violation occurred does not make a stop improper). A factual mistake does not make the investigatory traffic stop unreasonable, and the officers could have reasonably suspected that a traffic violation had occurred.

## II.    The Search of the Coat

The touchstone of the Fourth Amendment inquiry is reasonableness, as manifested in a person's "reasonable expectation of privacy." *See Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). The government violates the Fourth Amendment when it conducts an unreasonable search or seizure. *See Illinois v. Rodriguez*, 497 U.S. 177, 187 (1990). Here, the Government argues that the search of Mr. Davis's coat was reasonable, for four reasons: (1) Mr. Davis "abandoned" his coat; (2) Mr. Davis lacked a reasonable expectation of privacy in his coat; (3) the driver had actual or apparent authority to consent to the search of the coat; and (4) the search of the coat was inevitable, because the police would have searched the car based on their reasonable suspicion that the occupants were armed. Although the first three theories are unavailing, I find that the search of the coat was permissible based on the officers' reasonable suspicion that the occupants of the car were carrying firearms.

### A.    *Abandonment*

The government first contends that Mr. Davis retained no expectation of privacy in the pockets of his coat because "no reasonable person would expect that a coat left in a car during a police search of that car for firearms would remain private." (Supp. Resp. [60] at 12.) The reasonableness inquiry thus turns on Mr. Davis's "exhibition" of a privacy expectation, rather than his subjective expectations. *Id.* at 12–13. "By deliberately choosing to leave the coat behind, [Mr. Davis] relinquished any reasonable expectation of privacy he may have had prior to the consent search." *Id.* at 13. The Government relies on *United States v. Nordling*, where the

defendant "physically relinquished control of [a] tote bag when he left it on [an] airplane," and "twice denied having any carry-on baggage with him."  804 F.2d 1466, 1469–70 (9th Cir. 1986). The Ninth Circuit found that the defendant abandoned his bag on the plane, because these "actions were inconsistent with a continued expectation of privacy in the property." *Id.* at 1470.

Here, I find no evidence that Mr. Davis intended to abandon his coat.  As the *Nordling* court said, "two important factors [demonstrating abandonment] are denial of ownership and physical relinquishment of the property." *Id.* at 1469.  Neither factor is present here.  Mr. Davis never denied owning the coat; indeed, he was never asked if the coat belonged to him, and at least one officer testified that he knew the coat belonged to Mr. Davis prior to the search.  (Tr. [50] at 156:23–157:1.)  Furthermore, Mr. Davis did not voluntarily "relinquish" his coat.  Mr. Davis and his coat parted ways after the officers told the occupants of the car to exit.  Officer Petersen testified that Mr. Davis would not have been allowed to take the coat out of the car. *Id.* at 137:21–25.)  Mr. Davis neither denied owning the coat nor voluntarily relinquished his control of the coat, and thus did not abandon his coat and the concomitant expectation of privacy.

### B.    *Whether the Coat is a "Container"; i.e., Whether Mr. Davis Had an Expectation of Privacy in His Coat*

Consent to search a car is generally presumed to extend to all closed containers within the car. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991).  There is an exception, however, for "private, closed containers" belonging to third parties but located in the area to be searched. *See United States v. Davis*, 332 F.3d 1163, 1167 (9th Cir. 2003) (internal quotation omitted) ("[a] person has an expectation of privacy in his or her private, closed containers and does not forfeit that expectation of privacy merely because the container is located in a place that is not controlled exclusively by the container's owner.").

The Government argues that Mr. Davis's coat cannot properly be considered a "private,

closed container." (Supp. Resp. [60] at 15.) First, an article of clothing is unlike "traditional" containers receiving Fourth Amendment protection. *See, e.g.*, *Davis*, 332 F.3d at 1168 (closed gym bag); *United States v. Fultz*, 146 F.3d 1102, 1105 (9th Cir. 1998) (closed cardboard box); *United States v. Welch*, 4 F.3d 761, 764 (9th Cir. 1993) (latched purse). Second, the Government argues that the coat's location in a vehicle, as opposed to a house or hotel room, diminishes the closed container rationale all the more. (Supp. Resp. [60] at 16.) Finally, Mr. Davis's coat was left in an open, accessible area of the car, which "can be readily distinguished from the carefully stored, hidden, and segregated items requiring separate consent[.]" *Id.* at 18. In sum, this case can be distinguished from previous closed-container cases, and "a coat with wide, open pockets" is simply not a container for Fourth Amendment purposes. *Id.* at 19.

Mr. Davis argues that his coat is indeed a container, and he retained an expectation of privacy in its contents even after the driver granted consent to search the car. (Def.'s Supp. Reply [61] at 47–52.) The Court has continually rejected a distinction between "worthy" and "unworthy" containers, instead finding that "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." *United States v. Ross*, 456 U.S. 798, 822–23 (1982). The Fourth Amendment's protections vary in different settings, based on privacy expectations, not on attributes of the container. *Id.* Articles of clothing found within an automobile can indeed be "containers" for Fourth Amendment purposes. *See New York  v. Belton*, 453 U.S. 454, 460 n.4 (1980) ("'Container' here denotes any object capable of holding another object[, such as] closed or open glove compartments, consoles, or other receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, clothing, and the like."). The fact that Mr. Davis lacked exclusive control over the car does not diminish his coat's privileged status. *See United States v. Monghur*, 588 F.3d 975, 978 (9th Cir. 2009).

The government's focus on the physical attributes of Mr. Davis's coat is misplaced.  Any object that conceals its contents from plain view may be afforded constitutional protection.  *See Ross*, 456 U.S. at 822–23.  That the container belonging to Mr. Davis was a coat lacking zippers or buttons is not constitutionally significant.[5]  On the other hand, what *is* significant is context, because  "the protection afforded by the [Fourth] Amendment varies in different settings."  *Id.* at 823.  Thus, the proper inquiry is not whether Mr. Davis's coat is or is not a "container," but whether Mr. Davis had an expectation of privacy in his coat at the time of the search.  I find that he did have such an expectation.  First, as discussed above, Mr. Davis did not abandon his coat, and was only separated from his coat because the officers required the occupants of the car to exit.  Second, while it is true that the coat was not located in a secure, discrete location, such as the trunk, the circumstances of this case make that fact irrelevant.  Before Mr. Davis left the car, his coat was sitting on his lap.  Finally, Mr. Davis's coat was being used in a manner consistent with a reasonable expectation of privacy, in that the firearm was located in a pocket of the coat and was not in view.  Mr. Davis surely had an expectation of privacy *before* he left the car, and I find that Mr. Davis retained that expectation after leaving the car without his coat at the behest of the police.  His coat was a "container" for Fourth Amendment purposes, and Mr. Davis did not "forfeit [his] expectation of privacy" simply because his coat was in a vehicle over which he did not exercise exclusive control.  *See Davis*, 332 F.3d at 1167 (internal quotation omitted).

**C.**    ***Actual or Apparent Authority to Consent***

The police may rely on a third-party's demonstration of apparent authority to consent to a

---

[5] As the *Ross* Court put it:
> [J]ust as the most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion, so also may a traveler who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf claim an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attaché case.

*Ross*, 456 U.S. at 822 (footnote omitted).

search, even when that party lacks common authority over the item or place being searched. *See Rakas v. Illinois*, 439 U.S. 128 (1978). However, the apparent authority doctrine "is applicable only if the facts believed by the officers to be true would justify the search as a matter of law." *Welch*, 4 F.3d at 764. The Government argues that in this case, Mr. Davis's conduct (or lack thereof) makes the officers' reliance on the apparent authority of the driver to consent to a search of the coat reasonable. (Supp. Resp. [60] at 22.) Mr. Davis was present when the car was searched, yet left his coat in the car and did not object to the search in any way. *Id.* The Government argues that when a defendant is present and aware of a search, but remains silent, the officers conducting the search may reasonably rely on the apparent authority of the third-party's consent. *Id.* (citing, inter alia, *United States v. Dunkley*, 911 F.2d 522, 526 (11th Cir. 1990) (per curiam) (defendant's failure to object to driver's consent to a search of a car "confirms that [the driver] indeed had the requisite authority to consent to the search")). The Government also relies on cases where a defendant's failure to withdraw consent or object to the scope of a search indicates that the search was reasonable. *See, e.g.*, *United States v. Mines*, 883 F.2d 801, 804–05 (9th Cir. 1989) ("[defendant] might have withdrawn or limited his consent, even during the search. His failure to do so indicates he consented to the entire search and everything it revealed."); *United States v. Perez*, 37 F.3d 510, 516 (9th Cir. 1994) (defendant's failure to object to an ongoing vehicle search after first giving consent "is properly considered as an indication that the search was within the scope of the initial consent"). Because Mr. Davis was present throughout the search, and failed to object to the scope or limit its scope, "the officers reasonably believed that the driver was authorized to grant consent to search the entire vehicle, including the coat[.]" (Supp. Resp. [60] at 22.)

I find that the search of Mr. Davis's coat cannot be justified by the actual or apparent

authority of the driver.  A search premised on the apparent authority of a third party is only justified when the government "proves that the officers who conducted [the search] reasonably believed that the person from whom they obtained consent had the actual authority to grant that consent." *United States v. Arreguin*, 735 F.3d 1168, 1175 (9th Cir. 2013) (internal quotations omitted).  The Government has made no such showing.  First, the officers were aware at the time of the search that the coat belonged to Mr. Davis, not the driver, and could not reasonably believe that the driver had the authority to consent to a search of the coat, in lieu of Mr. Davis.  *See Welch*, 4 F.3d at 764.  Second, Mr. Davis's failure to object to a search of his coat is not significant.  The failure to withdraw consent or object to the scope of a search indicates that a search is reasonable when the *defendant* is the party granting initial consent.  *See Mines*, 883 F.2d 804–05; *Perez*, 37 F.3d at 516.  Here, of course, Mr. Davis never consented to a search of the car or of his coat.  The Government's argument inverts the protections of the Fourth Amendment by requiring a person to affirmatively deny consent in order to enjoy their right to be free from unconstitutional searches.  Consent is only valid if given voluntarily, and every person has the right to withhold their consent.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49 (1973).  Mr. Davis was not required to tell the police that he was not consenting to a search of his coat, and the officers could not reasonably rely on the apparent authority of the driver to consent to the search.

> **D.**    ***Reasonable Suspicion That the Occupants Were Armed***

Finally, the Government argues that even if Mr. Davis had a legitimate expectation of privacy in his coat, and the driver lacked actual or apparent authority to consent to the search, the discovery of the handgun was inevitable because "the officers would have checked the coat for weapons before returning the coat to defendant or allowing defendant back into the car."  (Supp.

Resp. [60] at 23.)  Under *Terry v. Ohio*, a police officer with reasonable suspicion to believe that a suspect may be "armed and dangerous" may frisk that person "to determine whether the person is . . . carrying a weapon."  392 U.S. 1, 24 (1968).  In *Michigan v. Long*, the Court enlarged *Terry*'s applicability to include "search[es] of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden."  463 U.S. 1032, 1049 (1983).  Vehicle searches based on reasonable suspicion are justified because "roadside encounters between police and suspects are especially hazardous, and danger may arise from the possible presence of weapons in the area surrounding a suspect."  *Id.*  Further, the police may search the inside of a car when they have reasonable suspicion to believe that any passenger, not just the suspect or arrestee, may be armed and dangerous.  *See Arizona v. Gant*, 556 U.S. 332, 346–47 (2009).  Finally, reasonable suspicion allows the search of items found within a car, in addition to the car itself.  *See, e.g.*, *Long*, 463 U.S. at 1048–49 (citing *New York v. Belton* for the proposition that a search of the interior of a car includes items and containers found within the car); *United States v. Wilkerson*, 598 F.2d 621, 625 (D.C. Cir. 1978) (officer reached into car and patted jacket lying on the front seat, revealing a shotgun, which "was a reasonable and proper protective search for a weapon; the subsequent grasping of the weapon under the coat . . . followed inexorably").

The Government contends that the search was justified by the officers' reasonable suspicion that the occupants of the car were armed.  (Supp. Resp. [60] at 25–27.)  That suspicion was based on the recent increase in gang-related violence, the presence of the Mercedes at a funeral for a slain gang-member earlier in the day, the presence of the Mercedes at an apartment complex known to the police as a locus of gang activity, and the officers' recognition of some of the passengers as known gang members or gang affiliates.  *Id.* at 25.  Further, a records check

revealed that Mr. Davis was on probation, and the officers observed Mr. Davis "exhibiting strange behavior." *Id.*

Mr. Davis argues that the search could not have been predicated on reasonable suspicion, because "none of the police officers expressed any fear or felt any threat of potential harm from the occupants of the white Mercedes." (Def.'s Supp. Reply [61] at 59.) Instead, the officers described the encounter as "almost friendly," and all of the occupants were "very compliant and cooperative." (Tr. [50] at 115:10, 138:19.) Further, Mr. Davis argues that the Government has failed to offer any evidence that the officers possessed articulable facts that Mr. Davis was involved in criminal activity, or that he possessed a weapon or posed a threat. (Def.'s Supp. Reply [61] at 61.)

I find that the facts known to the officers at the time of the search provided reasonable suspicion that the occupants of the car were armed, justifying a protective search of both the occupants and interior of the car. *See Terry*, 392 U.S. at 24; *Long*, 463 U.S. at 1048–49. Reasonable suspicion does not rise and fall with an officer's subjective feelings of fear; rather, it is based on an officer's reasonable belief, based on articulable facts, that a person may be armed and dangerous. First, the officers knew that gang activity had increased in recent weeks, and that retaliatory violence was ongoing. This knowledge, standing alone, is insufficient to provide reasonable suspicion that any given person is armed and dangerous. However, the officers also possessed articulable facts regarding both the Mercedes and its occupants that could lead them to suspect that the occupants were armed. The Mercedes was observed that same day at the funeral of a gang member and an apartment complex frequented by gang members, and the officers recognized some of the occupants of the car as gang affiliates. In sum, these facts, known to the officers at the time of the search, provided the basis to form a reasonable suspicion that the

occupants were armed, justifying a protective search of the car and the items found within.

Thus, the search of the coat and the discovery of the weapon did not violate Mr. Davis's Fourth

Amendment rights, and the evidence is admissible.

## CONCLUSION

For the foregoing reasons, Mr. Davis's motion to suppress [24] is DENIED.

IT IS SO ORDERED.

DATED this <u>2nd</u> day of April, 2014.

/s/Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge

ATTACHMENTS



Government Exhibit 4



Government Exhibit 5



Defense Exhibit 101E



Defense Exhibit 101G



Defense Exhibit 101H



Defense Exhibit 101J